IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 2, 2004

## STATE OF TENNESSEE v. ROBERT SANFORD BARNES

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7426    Joseph H. Walker, Judge**

---

**No. W2003-02967-CCA-R3-CD  - Filed February 11, 2005**

---

A Lauderdale County jury convicted the Defendant, Robert Sanford Barnes, of reckless endangerment, attempted rape, robbery, aggravated burglary, and assault.  The trial court sentenced the Defendant, as a career offender, to an effective sentence of forty-five years for the felony convictions, plus consecutive sentences of eleven months and twenty-nine days for each of the two misdemeanor convictions.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain any of his five convictions; (2) the trial court improperly classified the Defendant as a career offender; and (3) the trial court erred when it ordered that the Defendant's sentences run consecutively.  Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH, and J.C. MCLIN, JJ., joined.

Gary F. Antrican, Somerville, Tennessee, for the appellant, Robert Sanford Barnes.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Facts**

This case arises from crimes committed against James Johnson and his wife, Vernell Johnson, in Ripley Tennessee.  A jury convicted the Defendant of reckless endangerment, attempted rape, robbery, aggravated burglary, and assault.  The trial court sentenced the Defendant to eleven months and twenty-nine days for each of the two misdemeanor convictions, and it sentenced him, as a career offender, to fifteen years for each of the three Class C felony convictions, with all the sentences to be served consecutively.  On appeal, the Defendant contends that: (1) the evidence is

insufficient to sustain any of his five convictions; (2) the trial court improperly classified him as a career offender; and (3) the trial court erred when it ordered that his sentences run consecutively.

## A. Trial

At the Defendant's jury trial, the following evidence was presented: Norris Patricia Wheeler testified that she is Mrs. Verness Johnson's sister, and, in July 2001, she lived about seven miles away from the Johnsons' house. She said that Mrs. Johnson is seventy-eight years old. Wheeler testified that, on July 23, 2001, "sometime after lunch," Mrs. Johnson called "crying and screaming" that she had been raped and her husband had been injured. During this conversation, Mrs. Johnson told her that she was afraid to call 911 because the attacker threatened to kill her and her husband if she called the police. Wheeler said that, immediately after she spoke with Mrs. Johnson, she called 911, and then she and a friend went over to the Johnsons' house.

Wheeler testified that, when she arrived at the Johnsons' house, the police and paramedics were already at the house. She stated that paramedics were putting Mr. Johnson into an ambulance while the police were questioning Mrs. Johnson. Wheeler stated that, after the police were finished questioning Mrs. Johnson, she then drove Mrs. Johnson to the hospital where Mr. Johnson was being treated. On cross-examination, Wheeler testified that, during her initial conversation with Mrs. Johnson, Mrs. Johnson only identified her attacker as "a colored man."

Rita Burnett, an officer with the Ripley Police Department, testified that she was one of the first officers to arrive at the Johnsons' house on July 23, 2001. She said that she arrived within minutes of Wheeler's 911 call. Officer Burnett recalled that two other officers, Lieutenant Steve Sanders and Officer Richard Tidwell, both arrived at the same time she did. The officer testified that, when she arrived, "[M]r. Johnson was on the floor . . . Mrs. Johnson was screaming that he was dead and to get some help for him, and that someone had forced his way in, beaten her husband and d[one] things [to] her." Officer Burnett stated that Mrs. Johnson was clothed and was "hysterical." She said that she began trying to calm Mrs. Johnson down, while Officer Tidwell, a part-time paramedic, assisted Mr. Johnson.

Officer Burnett said that she gathered, from the crime scene, Mrs Johnson's underwear, jeans, blouse, and two wash cloths used by Mrs. Johnson to "wash up," and she gave all of those items to Lieutenant Sanders as evidence. The Officer stated:

> [Mrs. Johnson] said that the [Defendant] had come in and just started beating [Mr. Johnson]. And then [the Defendant] had this fork and he was telling [Mrs. Johnson] to get in the room. And when she got in the room, [the Defendant] made her take her clothes off and get on the bed. Then [the Defendant] got on top of [Mrs. Johnson]. And [Mrs. Johnson] said that she asked [the Defendant] not to rape her, and he said that he wasn't. And he was humping on her and sucking on her breasts. And then [Mrs. Johnson] said that she believed that [the Defendant] must have gotten relieved because she felt something squirt all over her.

Officer Brunett said that Mrs. Johnson also told her that the Defendant went through Mr. Johnson's pockets, and then he asked Mrs. Johnson if she had any money. Mrs. Johnson said that the Defendant used a metal fork in his attack of the couple. The officer testified that she went to the hospital with Mrs. Johnson, and she witnessed Dr. Murray perform Mrs. Johnson's rape kit. Officer Burnett said that Mrs. Johnson's rape kit took about fifteen minutes to perform, and she recalled that Mrs. Johnson was still very upset during the examination.

The officer said that she was also present when Mrs. Johnson was shown a photographic line-up at the hospital, at 5:55 p.m. on the day of the incident, and asked to identify her attacker. She said that the police had the name of a suspect, and they included a picture of him in the line-up. The officer said that, before showing Mrs. Johnson the line-up, Mrs. Johnson said that she knew that her attacker's name was "Robert B. something" because he had been to the Johnsons' house earlier the day of the attack looking for work, and Mr. Johnson had written his name down at that time. Officer Burnett said that the names of the individuals pictured in the line-up were on the back of the line-up page, but Mrs. Johnson was not shown these names before she identified the Defendant. Officer Burnett explained that Mrs. Johnson took her time with the line- up "[b]ecause she said she didn't want to make a mistake," and, after taking her time, Mrs. Johnson identified the Defendant as her attacker. The officer said that the Defendant had a "lazy eye" as a distinguishing physical characteristic. Officer Burnett testified that no one made any suggestion to Mrs. Johnson about which person to identify. Officer Burnett then identified the Defendant in court as the man Mrs. Johnson picked out of the photo line-up.

Mrs. Johnson testified that, in July of 2001, she and Mr. Johnson maintained residences in both Jackson and Ripley, Tennessee, and they split their time between the two homes. She recalled that, on July 23, 2001, she and Mr. Johnson drove from Jackson to their home in Ripley, planning to spend the week there. She said that Mr. Johnson drove them in his truck and that, at that time, he did not have any problems driving, breathing, or otherwise. Mrs. Johnson testified that, upon arriving at their home in Ripley, they began unloading the car. She said that Mr. Johnson finished unloading his things first, and then he sat down at the kitchen table. Mrs. Johnson explained that she was about to go get another load from the car when she heard a knock at the door. She said that the side carport door of their home has both a wooden door and a storm door, and she usually locks both, but on that day she only locked the interior wooden door. She stated that, when she opened the wooden door, she noticed that the Defendant had wedged his foot between the two doors. She testified that the Defendant had a metal fork with him, and kept this fork with him throughout the entire incident. She said that the Defendant "grabbed" her, and she began screaming. Mr. Johnson "jumped up from the table" to protect her, and then the Defendant grabbed Mr. Johnson. She testified that the Defendant choked Mr. Johnson, and Mr. Johnson fell to the ground. Mrs. Johnson explained that she begged the Defendant to quit, and offered him money. She said that the Defendant began dragging Mr. Johnson to the back bedroom, and, because she was concerned that Mr. Johnson would be further injured, she helped the Defendant drag Mr. Johnson. She stated that she thought Mr. Johnson was dying. She stated that the Defendant would not let her help Mr. Johnson, telling her that Mr. Johnson was not hurt and she "better be quiet, shut up."

Mrs. Johnson testified that the Defendant took her into her bedroom and made her lie down on the bed. She explained:

> [The Defendant] made me get up on my bed . . . [and he] tried to make me take my clothes off. And I don't remember, I was so scared and frightened, I don't remember taking my clothes off at all. I know I took part of my – one of my arms out of my bra . . . and he nursed my breasts, but he never did go up in me.

Mrs. Johnson stated that she told the Defendant she had an incurable sexually transmitted disease. Mrs. Johnson testified that she had seen the Defendant once before, when he came looking for work. She said that "when [she and Mr. Johnson] got to Ripley" the Defendant approached Mr. Johnson and asked for work, and Mr. Johnson told him that he would let the Defendant know if he had any work for him in the future. She said that, after the incident, as the Defendant was leaving her house, the Defendant demanded the twenty dollars she had previously offered to him. She said that the Defendant also searched Mr. Johnson's pockets. Mrs. Johnson stated that she did not give the Defendant permission to enter her house or to touch her. Mrs. Johnson identified the photographic line-up from which she had previously identified the Defendant as her attacker, and she again identified the Defendant as her attacker.

Cheryl Manns testified that she is the custodian of records at the Lauderdale County Baptist Memorial Hospital. Manns produced and testified about Mrs. Johnson's medical records from the night of July 23, 2001. She said that, according to the hospital records, Mrs. Johnson arrived at the hospital at 3:20 p.m., and, at 3:39 p.m., Mrs. Johnson was admitted and treated by Dr. Murray. She said that Mrs. Johnson was experiencing pain on the right and left side of her chest. Manns said that, according to the records, Mrs. Johnson's daughter signed the records because, due to Mrs. Johnson's condition at the time of admission, she was unable to sign. The records indicated that Mrs. Johnson suffered from an "alleged sexual assault." Manns also testified about Mr. Johnson's medical records from that evening, and she stated that he was diagnosed with "asphyxiation, strangulation injury, and new right hemiparesis." She testified that the records indicated that Mr. Johnson had a one-inch long laceration on his forehead and suffered shortness of breath.

Dr. Darrell Murray testified that he was working in the emergency room at the Lauderdale County Baptist Memorial Hospital on the evening of July 23, 2001, and he recalled treating Mrs. Johnson. Dr. Murray said that Mrs. Johnson came to the hospital because of an alleged rape, and he conducted a "rape kit"[1] on Mrs. Johnson. He testified that Mrs. Johnson's physical exam revealed that the alleged assault did not result in penetration, and on the rape kit he indicated that there was attempted penetration of the vagina. He said that the swabs taken during a rape kit examination are sent to a laboratory for microscopic examination to detect the presence of sperm.

---

[1]Dr. Murray explained that a rape kit is a State-prepared box containing supplies for physical exams and laboratory tests as well as forms and questionnaires to obtain the victim's account of the alleged sexual assault.

Special Agent Lawrence James, a special agent and forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified as an expert witness on DNA analysis. Agent James testified that, during this investigation, he analyzed the panties, blue jeans, blouse, two wash cloths, the rape kit, and swabs taken from the victim, which were all submitted to the TBI crime lab for testing. He noted that the rape kit victim information sheet stated that the victim had no consensual sexual activity in the seventy-two hours preceding the incident on July 23, 2001. Agent James testified that the tests conducted revealed the presence of sperm, and he matched the Defendant's DNA to DNA present on Mrs. Johnson's blue jeans. The agent said he was unable to get a DNA profile from the sperm sample found on the vaginal swabs because the sample was too small. The agent said that he did not examine or test the other items because the DNA match from the jeans was sufficient to determine from whom the sperm originated.

Samantha Wolfe testified that she works at the Jackson-Madison County General Hospital as the custodian of records, and she testified about Mr. Johnson's medical records. Wolfe said that, according to the records, Mr. Johnson was diagnosed with "acute left hemisphere cerebrovascular accident secondary to internal carotid occlusion." The records also indicated that Mr. Johnson was diagnosed with "chronic aspiration syndrome, secondary to [the above condition] . . . ." The records indicated that Mr. Johnson received intensive neurological care, but continued to suffer from dense right hemiparesis. Wolfe testified that the transfer form from the Ripley hospital indicated that Mr. Johnson had suffered a twenty minute loss of consciousness, resulting from strangulation, and that his symptoms were "unobtainable from [Mr. Johnson] due to a dense aphasia." Wolfe continued, noting several more descriptions of neurological damage and injuries to the neck and area of the carotid artery, all of which were caused by strangulation.

Elaine Matthews, the Johnsons' daughter, testified that, before the incident in July 2001, she frequently visited her parents, in Jackson and in Ripley, and her father was an active man. Matthews testified that, on July 23, 2001, she drove to Ripley immediately after receiving a call from her mother about the attack. She testified that her mother told her that "Robert B." attacked her and that Mr. Johnson knew him.

Lieutenant Steve Sanders, an investigator for the Ripley Police Department, testified that, when he arrived, he found Mrs. Johnson screaming that her husband was dying. He said that he followed Mrs. Johnson down the hall to locate Mr. Johnson, and he found Mr. Johnson lying on his back on the bedroom floor, gasping for breath. The lieutenant stated that, when Mrs. Johnson was more calm, she told the officers what happened, and told the officers that she knew the man who had attacked her as "Robert B." Lieutenant Sanders recalled that Mr. Johnson was in "serious condition" and had red marks on his neck and a laceration on his forehead.

Lieutenant Sanders said that he knew of two men by the name of "Robert B." in the area, one of whom was the Defendant. He said that the Defendant lived within a quarter mile of the Johnson's house, and he decided to place the Defendant's picture in a photographic line-up with several other men to show to Mrs. Johnson. The lieutenant said that he placed the names of the individuals on the back of the line-up, and he showed it to Mrs. Johnson, with the name-side down. He said that

she carefully reviewed the photographs and then identified the Defendant as the man who attacked her. Lieutenant Sanders testified that he searched for the Defendant, both in and out of Tennessee, and he ultimately located the Defendant in Tampa, Florida. He explained that, after locating the Defendant, he obtained a blood sample that he submitted to the TBI for comparison to the sperm found on Mrs. Johnson's blue jeans. He said that he received a report from the TBI crime lab indicating that the Defendant's DNA matched DNA found on Mrs. Johnson's blue jeans.

The Defendant testified that his most recent address in Ripley, Tennessee was on Chickasaw Street, and he has not resided with his grandmother at 206 Cleveland, which is on the Johnsons' street, since 1993. The Defendant said he did not commit any of the crimes that he is charged with. He testified that he is five feet and eleven inches tall and weighs 185 pounds, and, in July of 2001, he was a weightlifter and weighed 210 pounds. He noted that his most distinguishing physical feature is his "bad eye." The Defendant said that he is a handyman and works various odd jobs. He recalled that, on July 23, 2001, he went to a neighbor's house to mow the yard and wash the car. After completing his work there, he went over to Mrs. Johnson's house. He testified that, when he arrived at around 11:00 a.m., Mr. Johnson was not at home, and Mrs. Johnson was standing between the doors. He said that he asked if she had any work for him to do, and she told him no but invited him in. The Defendant testified that he informed Mrs. Johnson that he needed money. Mrs. Johnson told the Defendant that he was dirty, and he explained that he had been doing yard work for his neighbor. The Defendant testified that he had been to the Johnsons' several times prior to this day, and he and Mrs. Johnson "would always talk and things like that." He said, "[Mrs. Johnson] would always touch me on the arm, touch me on the hand." He explained that he did not think Mrs. Johnson intended anything sexual in these actions at first, but he later realized that she "had a special liking for [him]."

The Defendant testified that he "always" asked Mrs. Johnson for money, and on that day, he again asked Mrs. Johnson for money. He said that she responded that he "never pay[s] [her] back." He said that they continued talking and "one thing led to another." He said that Mrs. Johnson carried some money into the bedroom and placed it on the bed, and she took her clothes off. He testified that he did not want to have intercourse with her, but when she "touched [his] private spot" over his pants, he became physically aroused and removed himself from his pants. He stated that he requested that she perform fellatio on him, which she declined, but she "held it, and was playing with it." He said that, when he climaxed, his semen must have fallen onto her pants. The Defendant testified that, afterwards, he asked her for money, and she gave him twenty-three dollars. He said that Mrs. Johnson went into the bathroom, where he said he heard the water start running, and returned with a wet soapy towel and wiped him off. He estimated that, at this point, it was approximately 11:25 a.m. The Defendant denied threatening Mrs. Johnson or wielding a fork. He said that he never nursed Mrs. Johnson's breasts. He testified that he left the house at approximately 11:45 a.m.

The Defendant testified that, after leaving the Johnsons' house, he began to walk down Cleveland street, where Michael Bates, who happened to be driving by, stopped and gave him a ride to meet with his probation officer and his parole officer. The Defendant testified that he did not

return to the Johnsons' house after the prior visit. He said that he had known the Johnsons for approximately fourteen years, having done work for Mr. Johnson's uncle and having met Mrs. Johnson approximately fourteen or fifteen times.

Robert Madden testified that the Defendant came to his office for an appointment on July 23, 2001, and he produced a report sheet to support this. He said that he was unable to locate the time sheet, but he believed the Defendant came to his office sometime before lunch, estimating that it was mid-morning, around 10:00 or 10:30 a.m. On cross-examination, Madden testified that he could not be sure what time the Defendant came to his office.

Austin Thompson, Jr., testified that he was aware of the incident that occurred at the Johnsons' house in 2001, but he did not remember the specific day that it occurred. He said that he remembered that the Defendant came to his house to do yard work. On cross-examination, Thompson admitted that he did not know whether he saw the Defendant on July 23, 2001.

### B.  Sentencing Hearing

At the sentencing hearing, the following evidence was presented: Elaine Matthews testified that, after the Defendant attacked Mr. and Mrs. Johnson, Mr. Johnson has been unable to walk, talk, or care for himself, and, prior to the attack, he had been an active man. Matthews said that Mrs. Johnson had been severely traumatized by the Defendant's crime, she cannot sleep well, has lost her appetite, and says she is "just sick all over." She said that Mr. and Mrs. Johnson are rarely alone, and Mrs. Johnson is terrified of anyone coming to the house and worries every time she hears a knock on the door. She recalled that, on the few occasions when her mother has been left alone, she made multiple calls to 911, mistakenly believing that someone was attempting to break into the house.

The Defendant testified that he is sorry for what happened to the Johnsons, but denied that he was guilty. He admitted that he had prior convictions and that he had "been a pretty bad guy," but said that, every time he had committed a crime, he pled guilty in court and "[did] his time like a man." On cross-examination, the Defendant admitted to pleading guilty to charges in Florida, but claimed that he only did so in exchange for a five year probation offer. He also admitted pleading guilty to the 1994 aggravated assault charge in Tennessee. He testified that he did not know how many drug charges he had been convicted for, but he knew that he plead guilty to some drug offenses. He admitted pleading guilty to the two petit larceny charges in 1989. He claimed that some of the convictions on his record did not apply to him and were mistakenly included in his record.

The trial court found that the Defendant was a career offender because he had at least six prior felony convictions of Class C or higher. The trial court found that the following enhancement factors applied: (2) criminal history in addition to that necessary to establish the appropriate sentence range; (9) a previous unwillingness to comply with the conditions of a sentence involving release into the community; and (14) the crimes were committed while on parole or release status. Tenn.

Code. Ann. § 40-35-114(2), (9), (14) (2003). The trial court also found that, because these felony offenses were committed while the Defendant was on parole, Tennessee Rule of Criminal Procedure 32 (c)(3)(A) requires that the Defendant's sentences run consecutively to the sentences for which he was on parole, and any other sentences he is currently serving. Further, the trial court found that the Defendant's sentences in this case should run consecutively to each other, finding that: (1) the defendant is a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood; (2) the defendant has an extensive record of criminal activity; (4) the defendant is a dangerous offender who displays little regard for human life, and no hesitation about committing a crime with a high risk to life; and (6) the defendant's offenses were committed while on probation.. Tenn. Code. Ann. § 40-35-115(1), (2), (4), (6) (2003). The trial court then sentenced the Defendant to an effective sentence of forty-five years for the felony convictions, which must be served as a career offender. In summary, the Defendant was sentenced as follows:

> Count 1: Reckless Endangerment, a Class A misdemeanor, eleven months and twenty-nine days, at 75%;
> Count 2: Attempted Rape, a Class C felony, fifteen years, as a career offender, at 60%;
> Count 3: Robbery, a Class C felony, fifteen years, as a career offender, at 60%;
> Count 4: Aggravated Burglary, a Class C felony, fifteen years, as a career offender, at 60%; and
> Count 5: Assault, a Class A misdemeanor, eleven months and twenty-nine days, at 75%.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred in classifying him as a career offender; and (3) the trial court erred in ordering consecutive sentences.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs,

995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Reckless Endangerment

The Defendant contends that the evidence is insufficient to support his conviction for reckless endangerment. He asserts that he was not at the Johnsons' home at the time that the crime occurred and, further, there is no proof that Mr. Johnson suffered serious bodily injury or imminent danger of death. Pursuant to Tennessee statute, reckless endangerment occurs when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a) (2003). In the case under submission, the evidence presented at trial is sufficient to sustain the Defendant's conviction for this crime. As to the Defendant's first assertion, that he was not at the Johnsons' home at the time of the crime, we note that the jury rejected that assertion. As stated above, questions concerning the credibility of witnesses and the weight and value of the evidence are left to the trier of fact. Liakas, 286 S.W.2d at 859. Furthermore, the evidence showed that the Defendant forced his way into the Johnsons' home, and then he choked Mr. Johnson, a man in his late seventies, causing him to lose consciousness and fall to the floor. Mrs. Johnson testified that the Defendant left Mr. Johnson unconscious and denied Mrs. Johnson the chance to check on, or get any assistance for, her husband. Mr. Johnson's medical records indicated that he suffered serious injury as a result of the Defendant's strangulation of him. This evidence is sufficient to support the jury's finding that the Defendant recklessly engaged in conduct that placed or may have placed the victim in imminent danger of death or serious bodily injury.

### 2. Attempted Rape

The Defendant contends that the evidence is insufficient to support a conviction for the crime of attempted rape. Specifically, the Defendant argues that the State failed to carry its burden of proof as to the requisite element of the Defendant's intent to sexually penetrate Mrs. Johnson. Rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim . . . without the consent of the victim." Tenn. Code Ann. § 39-13-503(a) (2003). "'Sexual Penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997). According to the Tennessee Code:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3) (2003). Thus, to convict the Defendant of attempted rape, the State must prove that the Defendant acted with the intent to rape Mrs. Johnson and that he took a substantial step towards that end. See Tenn. Code Ann. §§ 39-12-101(a)(3); 39-13-503(a)(2).

In the case under submission, the evidence is sufficient to sustain the Defendant's conviction for attempted rape. The evidence at trial proved that, after forcing his way into the Johnson home, the Defendant forced Mrs. Johnson into her bedroom and demanded that she remove her clothes and lay down on the bed. The Defendant then nursed her breasts and rubbed his body against her body. The Defendant requested that Mrs. Johnson perform fellatio on him, but she did not know what that was and was unable to do so. Mrs. Johnson told the Defendant that she had an incurable sexually transmitted disease, and the Defendant then forced Mrs. Johnson to manually stimulate him until he ejaculated on the inside of Mrs. Johnson's jeans. Mrs. Johnson testified that she did not invite or consent to the Defendant's actions. At trial, the Defendant asserted that he had consensual sexual activity with Mrs. Johnson, an assertion that the jury rejected. Viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's conviction for attempted rape.

### 3. Robbery

The Defendant contends that the evidence is insufficient to support his robbery conviction because, when he first arrived, Mrs. Johnson offered to give him money to leave. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (2003). Tennessee Code Annotated section 39-14-103 (2003) states, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." There was evidence at trial that the Defendant forced his way into the Johnsons' home, strangled Mr. Johnson causing a loss of consciousness, and forced Mrs. Johnson to submit to sexual acts. Mrs. Johnson testified that the Defendant used a fork in a threatening manner during the entire incident. She said that, when the Defendant entered the home, she begged him to leave her and her husband alone, offering him money. Then, after the Defendant was sexually gratified, he demanded money from Mrs. Johnson, which she gave to him. It is reasonable that the jury determined that the Defendant obtained money from Mrs. Johnson by putting her in fear. This evidence is sufficient to support the Defendant's robbery conviction.

### 4. Aggravated Burglary

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated burglary. He asserts that he was not at the Johnson home at the time of the burglary and,

even if he were, there were no signs of forced entry into the home. "Aggravated burglary is burglary of a habitation as defined in §§ 39-14- 401 and 39-14-402." Tenn. Code Ann § 39-14-403(a) (2003). A person commits burglary when that person, without the effective consent of the property owner, "(1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault; . . . (3) Enters a building and commits or attempts to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402 (a)(1), (3) (2003).

Importantly, we note here that aggravated burglary does not require that the habitation be entered by force, it only requires that a habitation be entered and that a felony be committed, or attempted, therein. In the case under submission, we again conclude that the jury rejected the Defendant's assertion that he was not at the Johnson home at the time of the crime. Questions concerning the credibility of witnesses and the weight and value of the evidence are left to the trier of fact. Liakas, 286 S.W.2d at 859. Additionally, the proof at trial, viewed in the light most favorable to the State, showed that the Defendant forcibly entered the Johnsons' home, which is a habitation, by placing his foot between the two doors to the house so Mrs. Johnson was unable to shut the door. Once inside, he committed multiple felonies, including attempted rape and robbery. This evidence is sufficient to support the Defendant's conviction for aggravated burglary.

### 5. Assault

The Defendant submits that the evidence is insufficient to support his assault conviction, contending that he was not the person who committed this crime. He asserts that there were "many evidentiary problems with this case" and points to the following alleged evidentiary problems: the fact that Lieutenant Sanders did not dust for fingerprints; Lieutenant Sanders did not collect a blood sample; Mrs. Johnson testified at a preliminary hearing that she was not sure if the Defendant committed the crime; Mrs. Johnson's description of her attacker did not match the Defendant and did not include his distinguishing lazy eye. Initially, we note that these are primarily issues of credibility, and issues concerning the credibility of witnesses and the weight and value of the evidence are left to the trier of fact. Liakas, 286 S.W.2d at 859.

According to the Tennessee Code, "A person commits assault who: (1) [i]ntentionally, knowingly or recklessly causes bodily injury to another; or (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101 (2003). In the case under submission, the evidence proved that the Defendant, after forcing his way into the Johnsons' home, strangled Mr. Johnson until Mr. Johnson was unconscious. Mr. Johnson's medical records showed that he suffered a "strangulation injury" and "loss of consciousness for 20 minutes." As a result, Mr. Johnson is unable to move the right side of his body, unable to walk or talk, and unable to care for himself. Mrs. Johnson identified the man who attacked her husband as a man named "Robert B.," and later she identified the Defendant's photograph in a photographic line-up. This evidence is sufficient to support the Defendant's assault conviction.

## B.  Sentencing

The Defendant contends that the trial court erred when it sentenced him in two regards: (1) the trial court erred in classifying the Defendant as a Range III Career Offender; and (2) the trial court improperly ordered that his sentences run consecutively.  When a defendant challenges the length, range or the manner of service of a sentence, it is the duty of this Court to conduct a <u>de novo</u> review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40-35-401(d) (2003).  This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" <u>State v. Ross</u>, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting <u>State v. Pettus</u>, 986 S.W.2d 540, 543 (Tenn. 1999)); <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. <u>State v. Dean</u>, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); <u>State v. Butler</u>, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); <u>State v. Smith</u> 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).  In conducting a <u>de novo</u> review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. § 40-35-210 (2003); <u>State v. Taylor</u>, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).  The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances.  Therefore, we review its decision <u>de novo</u> with a presumption of correctness.  Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result.  <u>See</u> Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).  We note that the defendant bears the burden of showing that the sentence is improper.  Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; <u>Ashby</u>, 823 S.W.2d at 169.

### 1.  Sentence Range Classification

The Defendant contends that the trial court erred in classifying him as a career offender.  He submits that the State failed to provide him adequate notice of its intent to seek career offender status, thus depriving him of the opportunity to make an informed decision regarding his options before trial.  The State counters that notice to seek career offender status was timely and proper.

In sentencing a defendant, the trial court must first determine the appropriate offender status based upon a defendant's prior criminal record. See Tenn. Code Ann. § 40-35-104 to -109 (2003). The court then determines the appropriate range to establish the minimum and maximum sentence available. See id. If a defendant is convicted of a Class C felony and has at least six prior felony convictions of Class A, B, or C, then the defendant should be classified as a "career offender." Tenn. Code Ann. § 40-35-108(a)(1). "'Prior conviction' means a conviction or an offense occurring prior to the commission of the offense for which the defendant is being sentenced." Tenn. Code Ann. § 40-35-108(b)(1). Tennessee Code Annotated § 40-35-108(b)(4), otherwise referred to as the twenty-four hour merger rule, provides as follows:

> Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions; however, acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct . . . .

Section 40-35-202(a) of the Tennessee Code requires that the State file notice to seek enhanced punishment or career offender classification, setting forth the convictions upon which the career offender status can be based, within ten days preceding trial. Tenn. Code Ann. § 40-35-202(a).

In this case, the State filed a notice, within the ten days preceding trial, that listed six felony convictions. Although, after trial, the State filed an amended notice listing several other convictions, this second notice was outside the ten day time limitation. Thus, for the Defendant to be classified as a career offender, the original notice must list at least six prior felony conviction of Class C or higher. The State's original notice included the following felony convictions:

(1) Aggravated Robbery, offense dated February 17, 1994, a Class B felony;

(2) Delivery of greater than .5 grams Schedule II Narcotics, offense dated November 10, 1993, a Class B felony;

(3) Delivery of less than .5 grams Schedule II Narcotics, offense dated November 10, 1993, a Class B felony;

(4) Delivery of less than .5 grams Schedule II Narcotics, offense dated January 29, 1994, a Class C felony;

(5) Attempted Delivery of Schedule II Narcotics, offense dated November 1, 1993, a Class C felony;

(6) Delivery of less than .5 grams Schedule II Narcotics, offense dated January 12, 1994, a Class C felony; and

(7) Attempted Sale of Schedule II Narcotics, offense dated March 19, 1992, a Class

C Felony . . . .

We conclude that the evidence does not preponderate against the trial court's finding that the Defendant is a career offender. As listed above, the notice that the State gave to the Defendant clearly enumerated six prior felonies of Class C or higher for which the Defendant had been convicted. Five of the aforementioned seven previous felonies count as separate felonies for the purposes of determining whether the Defendant qualifies as a career offender. The two felonies occurring on the same date, November 10, 1993, count as one previous felony conviction because they occurred so close in time to each other. Therefore, the State's original timely notice listed six prior felony convictions of Class C or higher, and the Defendant was properly notified of the State's intent to seek career offender classification. This issue is without merit.

## 2. Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered that his sentences run consecutively to a sentence the Defendant must serve for a prior aggravated robbery conviction, and also consecutively to each other. The State counters that the trial court properly imposed consecutive sentences in accordance with Tennessee law. We agree with the State.

As to the Defendant's assertion that the trial court erred when it ordered that his sentences run consecutively to his sentence for a prior aggravated robbery conviction, we conclude that this issue is without merit. According to Rule 32(c)(3)(A) of the Tennessee Rules of Criminal Procedure, a sentence for a felony committed while on parole for a felony must be served consecutively to the remainder of the sentence for which the defendant was on parole. Here, the Defendant was on parole for his 1994 Aggravated Robbery conviction when he committed the crimes in this case. Because the Defendant's convictions in this case included felony offenses, Rule 32(c)(3)(A) applies and requires that the Defendant's sentences in the present case run consecutively to any unserved remainder of his sentence for the 1994 Aggravated Robbery conviction.

Further, we conclude that the trial court did not err when it ordered that the Defendant's sentences in this case run consecutively to one another. The trial court based this decision on the factors listed in Tennessee Code Annotated section 40-35-115. First, the trial court found that the Defendant was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood. Tenn. Code Ann. § 40-35-115(b)(1) (2003). Additionally, the trial court found that the Defendant has an extensive record of criminal activity. Tenn. Code Ann. § 40-35-115(b)(2). Next, the trial court found that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life. See Tenn. Code Ann. § 40-35-115(b)(4). Finally, the trial court determined that the Defendant committed these offenses while on probation. Tennessee Code Annotated section 40-35-115(b)(6) provides for consecutive sentences if the defendant committed the crimes in question while on probation. This Court has previously held that the terms

"probation" and "parole," although similar, were not synonymous for the purposes of section 40-35-115.  State v. Frederick Parks, No. W1999-01357-CCA-R3-CD, 2000 WL 1672341, at *3 (Tenn. Crim. App., at Jackson, Oct. 27, 2000), *no perm app. filed* (quoting State v. Pettus, 986 S.W.2d at 544).

After reviewing the record, we conclude that the evidence does not preponderate against the trial court's finding that the Defendant's sentence should run consecutively.  The trial court did not err when it found that Tennessee Code Annotated sections 40-35-115(b)(1) and (2) applied.  The Defendant's pre-sentence report and the testimony at the Defendant's sentencing hearing indicated that the Defendant has had at least thirteen various felony and misdemeanor convictions, dating back to 1986.  Specifically, the Defendant has multiple convictions for the sale and delivery of cocaine, two petit larceny convictions, two convictions for theft, one conviction for grand theft, a conviction for conversion, and a conviction for aggravated robbery.  The Defendant claims to have had various employers for odd jobs in 2001, but the Defendant has no other verified employment history.  Further, the Defendant testified at trial that he used to be a drug dealer.

Similarly, the trial court did not err when it found that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life.  The evidence showed that the Defendant attacked an elderly couple, both in their late seventies.  The Defendant choked Mr. Johnson until he was unconscious, left him on the floor, and denied Mrs. Johnson the chance to get any assistance for her unconscious husband.  The Defendant then forced Mrs. Johnson to engage in sexual activities with him.

Finally, we conclude that the trial court did not err when it determined that the Defendant committed these offenses while on probation.  Tennessee Code Annotated section 40-35-115(b)(6).  In this case, the Defendant was on parole when he committed the offenses for which he was convicted.  The Defendant was also on probation for a conviction on July 6, 2001.  Accordingly, we find no error in the trial court's application of this factor.  This issue is without merit

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm all of the Defendant's convictions and sentences.

_____
ROBERT W. WEDEMEYER, JUDGE

-15-